<u>**NOT FOR PUBLICATION**</u>

**UNITED STATES DISTRICT COURT**
**DISTRICT OF NEW JERSEY**

| | |
|---|---|
| In Re:   **Christ Hospital, Debtor—a New Jersey not-for-profit corporation** | **Civil Action No. 14-472 (ES)** **(Consolidated)** |
| **PRIME HEALTHCARE SERVICES, INC.,** | |
| **Appellant,** | **OPINION** |
| **v.** | |
| **HUDSON HOSPITAL PROPCO, INC., HUDSON HOSPITAL OPCO, LLC, HUDSON HOSPITAL HOLDCO, LLC, and VIVEK GARIPALLI,** | |
| **Appellees.** | |

<u>**Salas, District Judge**</u>

Appellant Prime Healthcare Services, Inc. ("Prime") seeks reversal of the bankruptcy court's December 3, 2013 Order ("Injunction Order"), enjoining Prime from pursuing certain economic tort claims against Appellees Hudson Hospital Propco, Inc., Hudson Hospital Opco, LLC, Hudson Hospital Holdco, LLC and Vivek Garipalli (collectively, "Hudson") filed in New Jersey Superior Court ("State litigation").   Prime also seeks reversal of the bankruptcy court's December 20, 2013 Order ("Stay Order") that, *inter alia*, declined to stay the Injunction Order pending appeal.   Finally, Prime also moves to withdraw the reference to bankruptcy court, claiming that the bankruptcy court did not have jurisdiction to hear this matter.

This Court has appellate jurisdiction to review the decision of the bankruptcy court pursuant to 28 U.S.C. § 158(a).   The Court held oral argument in this matter on May 16, 2014.   After full consideration of the parties' submissions and arguments, the Court affirms the

bankruptcy court's Injunction Order, and finds that the requests to withdraw the reference and to stay the bankruptcy court's Orders as specified below are moot.

## I.   BACKGROUND & PROCEDURAL HISTORY[1]

The parties are thoroughly familiar with the underlying background and largely do not dispute the facts.    The Court, therefore, limits its discussion to the salient facts and procedural history.    Briefly, the instant appeal stems from the sale of assets of Chapter 11 debtor Christ Hospital ("Debtor" or "Christ Hospital"), which is a New Jersey not-for-profit corporation.    On March 27, 2012, the Bankruptcy Court approved the sale of Christ Hospital's assets along with "free and clear" protections provided in 11 U.S.C. § 363(f) to the successful bidder Hudson. (Order Pursuant to 11 U.S.C. §§ 105(a), 363 and 365 and Fed. R. Bankr. P. 2002, 6004, 6006, and 9014 Granting Debtor (I) Authorization and Approval to Sell Substantially All of Its Assets Outside the Ordinary Course of Business, Free and Clear of Liens, Claims, Interests, and Encumbrances, Pursuant to Public Sale; (II) Approval of Form and Content of Asset Purchase Agreement Between Debtor and Successful Bidder; and (III) Authorization to Assume and Assign Certain Executory Contracts and Unexpired Leases And/Or Transfer of "Designation Rights"; (IV) Waiver of 14-Day Stay Pursuant to Fed. R. Bankr. P. 6004(h); and (V) Granting Other and Related Relief ("Sale Order"), RA3.

### A.  The Parties

Prime is a Delaware Corporation with its principal place of business in Ontario, California.

---

[1] The facts are taken from the appendices of the record on appeal as submitted by the parties.    (*See* D.E. No. 2, Designation of Record On Appeal ("RA__"); D.E. No. 3, Designation By Respondents/Appellees of Additional Items To Be Included In Record On Appeal ("RAIA__"); D.E. No. 7, Stipulation (modifying record on appeal to include March 23, 2012 Sale Hearing Transcript ("Mar. 23, 2012 Tr.")); D.E. No. 10, Stipulation (modifying record on appeal to include March 27, 2012 Sale Hearing Transcript ("Mar. 27, 2012 Tr.")); *see also* D.E. No. 13, Second Certification of Louis A. Modugno, Esq. (reproducing an appendix of Bates-stamped documents that the parties agreed form part of the record on appeal)).

(New Jersey Superior Court Complaint and Jury Demand, Mar. 13, 2013, RA4 ¶ 3).   Prime operates sixteen for-profit acute-care hospitals in California, Nevada, Pennsylvania and Texas and not-for-profit hospitals in California and Texas through a charitable organization.   (*Id.* ¶ 9).   It "specializes in the purchase, revitalization and turnaround of financially struggling acute care hospitals."   (*Id.*).

Hudson is a for-profit Delaware limited liability company with its principal place of business in Philadelphia, Pennsylvania.   (*Id.* ¶ 4).   Hudson owns three for-profit hospitals in Hudson County, New Jersey.   (*Id.*).

### B.  Pre-Petition Events

In 2011, Prime—who was interested in expanding into the New Jersey market—signed a Letter of Intent ("LOI") and Asset Purchase Agreement ("APA") to purchase Christ Hospital, which was experiencing serious financial challenges.   (Disclosure Statement Pursuant to Section 1125 of the Bankruptcy Code for the Joint Plan of Orderly Liquidation, Apr. 23, 2013, RA6 at 8). Prime also helped Christ Hospital borrow $5,600,000 and $1,000,000 during this time period. (*Id.* at 8, 11).

On December 23, 2011, Hudson submitted an unsolicited offer to purchase the assets of Christ Hospital.   (*Id.* at 10).   Shortly thereafter, on January 20, 2012, Community Healthcare Associates ("CHA") also submitted an unsolicited offer to purchase the assets of Christ Hospital. (*Id.*).   Notwithstanding these two unsolicited offers, Christ Hospital remained committed to moving forward with Prime's APA.   (*Id.*).

During this same time period, Christ Hospital learned the following:   (1) that the State of New Jersey's Charity Care advance payment was not materializing, and (2) that Christ Hospital's

Community Healthcare Asset Protection Act ("CHAPA") and Prime's Certificate of Need ("CON") applications were delayed beyond Prime's desired closing date.   (*Id.* at 9-10).   On January 31, 2012, Prime withdrew its bid for Christ Hospital.   (*Id.* at 11).

### C.  Christ Hospital's Chapter 11 Petition & Sale

On February 6, 2012, Christ Hospital filed a voluntary bankruptcy petition in the United States Bankruptcy Court for the District of New Jersey "with the intention that it would successfully negotiate and close a transaction with CHA, Hudson, Prime, or another qualified bidder for its assets, and at the same time preserve [Christ] Hospital and the important role it served in the delivery of care to the citizens of Hudson County."   (*In re Christ Hosp.,* No. 12-12906 (Bankr. D.N.J.); RA6 at 11).   One day later, on February 7, 2012, Prime filed a Notice of Appearance and Request For Service of Documents in the bankruptcy matter.   (Prime's Notice of Appearance, Feb. 7, 2012, RAIA2).   On February 8, 2012, Christ Hospital filed formal motion for approval from the bankruptcy court of the open bid procedures and auction process.   (RAIA4). The motion papers recognized Prime as a potential bidder:   "The Debtor wishes to successfully close a transaction with CHA, Hudson Holdco, Prime, or another qualified bidder for its assets." (RAIA4 at 3-4).   Although Prime was served with the Bid Procedures Order, Prime did not submit a bid and did not appear at the two-day sale hearing.   (RAIA6 at 15-16; Mar. 23, 2012 Tr.; Mar. 27, 2012 Tr.).

Following the open bid auction process and a two-day sale hearing, on March 27, 2012, the bankruptcy court approved the sale of Christ Hospital's assets to Hudson.   (RA3; *see also* RAIA6 at 15).   The bankruptcy court found, in significant part, that Hudson "is a purchaser in good faith, as that term is used in section 363(m) of the Bankruptcy Code" and that the agreement

was entered "from arm's-length bargaining positions and without collusion, and [Hudson] is entitled to the protections of section 363(m) of the Bankruptcy Code."   (RA3 ¶¶ K, L).   The Sale Order also found that "the terms and conditions of the Purchase Agreement . . . are fair and reasonable and the transaction contemplated by the Purchase Agreement is in the best interest of the Debtor, its creditors, and its estate."   (*Id.* ¶ Q).   Also, significantly, the Sale Order found that the "holders of such Liens and Claims (as defined below) who did not object, or withdr[a]w their objections, to the Sale or the Motion are deemed to have consented pursuant to section 363(f)(2) of the Bankruptcy Code."   (*Id.* ¶ P).

As a result of these factual findings, the bankruptcy court then ordered that "pursuant to sections 105 and 363 of the Bankruptcy Code, title to the Assets shall pass to the Successful Bidder . . . free and clear of any and all liens . . . , security interests, encumbrances and claims (including, but not limited to, any 'claim' as defined in section 101(5) of the Bankruptcy Code) . . . and other liabilities, causes of action and claims, to the fullest extent of the law, . . . known or unknown, whether arising prior to, on, or subsequent to the Petition Date . . . ."   (*Id.* ¶ 5).   The Sale Order also vested in the bankruptcy court "exclusive jurisdiction to enforce the provisions of this Order and the Purchase Agreement, and to resolve any dispute concerning this Order, . . . inclusive of those concerning the transfer of the Assets free and clear of the Liens and Claims."   (*Id.* ¶ 15). Having concluded that the successful bidder was a good-faith purchaser, the Sale Order also conveyed § 363(m) finality protections.   (*Id.* ¶ 24).    Again, Prime did not object to the bankruptcy court's findings of fact and conclusions of law.

On March 15, 2013, Christ Hospital filed a motion in bankruptcy court for approval of a Disclosure Statement and Joint Plan of Orderly Liquidation.   (RAIA5).   On April 23, 2013, the

bankruptcy court approved the Disclosure Statement.   (RA5).   On June 4, 2013, the court approved the Joint Plan of Orderly Liquidation ("Confirmation Order"), which reaffirmed the Sale Order and the bankruptcy court's jurisdiction.   (RA7).   Prime did not object.

### D.  State Litigation

On March 13, 2013, Prime filed a complaint in New Jersey state court, alleging that Hudson's

> ongoing *modus operandi* is to seek to buy hospitals <u>after</u> Prime Healthcare already has a [sic] signed asset purchase agreements with those hospitals, attempting to do indirectly what they could not do directly by organizing political, union, and community opposition in order to try to squeeze Prime Healthcare out of their asset purchase agreements, and then attempt to buy the hospital in question at a discounted price.

(RA4 ¶ 2).   Prime asserted five counts:   (1) Violation of the New Jersey Anti-Trust Act, N.J.S.A. 56:9-3 – Conspiracy (Count One); (2) Violation of the New Jersey Anti-Trust Act, N.J.S.A. 56:9-4(a) – Monopoly (Count Two); (3) Tortious Interference in Contractual Relations (Count Three); (4) Tortious Interference with Prospective Economic Gain (Count Four); and (5) Unfair Competition (Count Five).   (*Id.* ¶¶ 39-78).

Hudson moved to dismiss Prime's state court complaint.   (*See Prime Healthcare Servs., Inc. v. Garipalli*, No. L-1056-10, Opinion & Order (N.J. Super. Ct. Law Div. Aug. 22, 2013), RA9).   On August 22, 2013, the state court dismissed Counts One and Two, and dismissed the portions of Counts Three, Four and Five that addressed St. Mary's and St. Michael's Hospitals. (*Id.*).   The court, however, denied Hudson's motion to the extent Counts Three, Four and Five related to the acquisition of Christ Hospital.[2]   (*Id.*).

---

[2]  This Court will refer to these state law economic tort claims as "common-law claims."

On September 16, 2013, Hudson filed a motion for leave to appeal, which the New Jersey Superior Court, Appellate Division ("Appellate Division") granted on November 4, 2013. (RA10 & RA13).

### E.  Subsequent Court Proceedings

On September 30, 2013, Hudson also filed a motion for an injunction to enforce the Sale Order and Confirmation Order in bankruptcy court.   (RA11).   In response, Prime filed a cross-motion for an entry of an order withdrawing the reference to the bankruptcy court of Hudson's motion for an injunction in this Court.   (No. 13-6191, D.E. No. 1, RA12).   Prime also requested a stay of Hudson's injunction motion pending this Court's disposition of Prime's cross-motion to withdraw the reference, which the bankruptcy court denied in a bench ruling.   (*In re Christ Hosp.*, No. 12-12906 (Bankr. D.N.J.), Oct. 22, 2013 Tr. at 4:3-8, 12:10-13:10, RA2).

On December 3, 2013, the bankruptcy court granted Hudson's motion for an injunction, enjoining Prime from pursuing their common-law claims against Hudson.   *In re Christ Hosp.*, 502 B.R. 158 (Bankr. D.N.J. 2013).   In a comprehensive and well-reasoned opinion, the bankruptcy court held that:

- Prime's "economic tort claims are purported obligations of Hudson which 'are connected to or arise from' the § 363 sale of [free and clear] assets";

- Because Prime had notice and was aware of the § 363 sale but failed to object to the sale, Prime consented to the auction sale of free and clear assets;

- Prime collaterally attacked the Sale Order—later reaffirmed by the Confirmation Order—by filing its state court lawsuit during the pendency of this matter, and the Sale Order specifically enjoins collateral attacks on the sale of the free and clear assets;

- Although Prime's collateral attack on the Sale Order does not seek to set aside the sale, it presents an attack on the economic integrity of the § 363(b) sale and it directly attacks the "good faith" finding of the Sale Order;

7

- The bankruptcy court's "jurisdiction to interpret and enforce its sale and confirmation orders is historic and unimpeded by *Stern v. Marshall* or other recent developments in the law.   Moreover, the in rem aspect of § 363(b) sales remains unaltered by currently debated jurisdiction issues.   'Arising under,' 'arising in' and 'core' requirements of 28 U.S.C. §§ 1334(b) and 157(b)(2)(L) and (N) are well satisfied.   In addition, full and complete notice of the terms of sale was provided to Prime, thereby satisfying basic due process and fundamental fairness concerns; and, Prime (and only Prime) held the key to the existence at the time of the § 363(b) sale of its later advanced economic tort claims.   Prime: failed to disclose its claims; allowed the bankruptcy sale to proceed under the assumption that the purchaser would take 'free and clear' of such interests; collaterally attacked the sale contrary to the Sale Approval Order injunctive provisions; never sought recourse in this court, per Fed. R. Bankr. P. 9024 or otherwise, notwithstanding the active pendency of this Chapter 11 case; and, now attempts to fend off bankruptcy court enforcement on jurisdictional grounds.   Such tactics should not be permitted"; and

- The bankruptcy court was authorized to issue an injunction, and the New Jersey Superior Court's August 22, 2013 Opinion and Order did not "preempt Hudson's application."

*In re Christ Hosp.*, 502 B.R. at 185-86.

On December 10, 2013, Prime requested that the bankruptcy court stay the Injunction Order pending the appeal.   (RA14).   On December 20, 2013, the bankruptcy court denied Prime's motion, but modified the Injunction Order to "require Prime to seek the dismissal <u>without</u> prejudice in the State Court action."   (RA15 at 2).

Thereafter, the parties agreed and stipulated to staying the state court proceedings, pending Prime's appeals to this Court.   (No. 13-7881, D.E. No. 14; *see also* Prime's July 25, 2014 letter ("July 25, 2014 Letter"), D.E. No. 22).   The parties also stipulated to consolidating the four separately-docketed matters pending before this Court.[3]   (No. 14-471, Stipulation & Order, D.E. No. 10).

---

[3]  The consolidated bankruptcy appeal was captioned *Prime Healthcare Services, Inc. v. Hudson Hospital Propco, Inc., et. al,* and consolidated as civil action number 14-472.   (No. 14-471, D.E. No. 10).   The following civil actions were consolidated:   (1) No. 13-6191 (motion to withdraw reference); (2) No. 13-7881 (motion to stay December 3, 2013 and December 20, 2013 Orders); (3) No. 14-471 (appealing December 3, 2013 Injunction Order); and (4) No. 14-472 (appealing December 20, 2013 Stay Order).

## II.        STANDARD OF REVIEW

In reviewing a bankruptcy court's decision, the standard of review is determined by the nature of the issues presented on appeal.    Under Federal Rule of Bankruptcy Procedure 8013, "[f]indings of fact, whether based on oral or documentary evidence, shall not be set aside unless clearly erroneous, and due regard shall be given to the opportunity of the bankruptcy court to judge the credibility of the witnesses."    Fed. R. Bankr. P. 8013; *In re Miller*, 730 F.3d 198, 203 (3d Cir. 2013).    Thus, review of facts under the "clearly erroneous" standard is significantly deferential and requires a "definite and firm conviction that a mistake has been committed."    *In re CellNet Data Sys.*, 327 F.3d 242, 244 (3d Cir. 2003) (citation and quotation marks omitted).

On the other hand, legal conclusions from the bankruptcy court are subject to plenary review by the district court and are considered de novo on appeal.    *In re Trans World Airlines, Inc.*, 145 F.3d 124, 131 (3d Cir. 1998).    Finally, when a bankruptcy court exercises its discretion, those decisions are reviewed for abuse of discretion.    *Id.*

## III.        DISCUSSION

### A.    The Bankruptcy Court Properly Exercised Its Jurisdiction

Prime's overarching argument—largely relying on *Stern v. Marshall*—is that the bankruptcy court did not have jurisdiction to enjoin Prime's common-law claims.    (Appellant's Brief ("Prime Br.") at 17-40, D.E. No. 8; *see also* May 16, 2014 Tr. at 169:6-14).    Prime also maintains that its common-law claims against Hudson are not "core" claims under 28 U.S.C. § 157, and that the bankruptcy court's jurisdiction could not stem from 28 U.S.C. § 1334(b). (Prime Br. at 18-21).    And it claims that its common-law claims are not "related-to" the Christ Hospital bankruptcy.    (*Id.* at 21-25).    Prime also avers that the bankruptcy court failed to set

forth the basis for its proper exercise of jurisdiction and that its jurisdiction was limited after the confirmation of the plan.   (*Id.* at 25-32).

In response, Hudson argues that the bankruptcy court properly declared that the court had statutory jurisdiction to enforce its own orders that arose from the bankruptcy sale of the assets of Christ Hospital.   (Successful Bidder Entities' Brief in Opposition to Prime Healthcare Services, Inc.'s Appeal of the Bankruptcy Court's December 2013 Orders ("Hudson Opp.") at 21-33, D.E. No. 11).   In particular, Hudson claims that its injunction motion was a "core" matter because it sought to enforce the Sale Order and the Confirmation Order.   (*Id.* at 22-29).   Hudson, therefore, contends that Prime's discussion of related-to jurisdiction is irrelevant, because it was a core matter.   (*Id.* at 29).   Further, Hudson asserts that the bankruptcy court had jurisdiction to enforce its own orders even post-confirmation.   (*Id.* at 30-31).   Finally, Hudson observes that "*Stern* was a self-described 'narrow' opinion . . . which held that bankruptcy courts did not have constitutional authority to enter final judgments on state law counterclaims that were not resolved in the process of ruling on a creditor's proof of claim."   (*Id.* at 48 n.16).   Hudson claims *Stern* is inapposite because, here, the "Bankruptcy Court did not enter a judgment with respect to any state law claim[; i]t simply enjoined Prime from litigating a state law claim which is barred by two Bankruptcy Court Orders."   (*Id.*).

28 U.S.C. § 1334(b) provides, in pertinent part, that with few exceptions "district courts shall have original but not exclusive jurisdiction of all civil proceedings arising under title 11, or arising in or related to cases under title 11."   Section 157 further provides that district courts may refer such cases to the bankruptcy court.   28 U.S.C. § 157(a); *see also Stern v. Marshall*, 131 S. Ct. 2594, 2603 (2011) ("The manner in which a bankruptcy judge may act on a referred matter

depends on the type of proceeding involved.").   In particular, bankruptcy courts may hear "core"

proceedings arising under title 11 or arising in a case under title 11, which "core" matters include

but are not limited to:

> (A) matters concerning the administration of the estate;
>
> (B) allowance or disallowance of claims against the estate or exemptions from property of the estate, and estimation of claims or interests for the purposes of confirming a plan under chapter 11, 12, or 13 of title 11 but not the liquidation or estimation of contingent or unliquidated personal injury tort or wrongful death claims against the estate for purposes of distribution in a case under title 11;
>
> (C) counterclaims by the estate against persons filing claims against the estate;
>
> (D) orders in respect to obtaining credit;
>
> (E) orders to turn over property of the estate;
>
> (F) proceedings to determine, avoid, or recover preferences;
>
> (G) motions to terminate, annul, or modify the automatic stay;
>
> (H) proceedings to determine, avoid, or recover fraudulent conveyances;
>
> (I) determinations as to the dischargeability of particular debts;
>
> (J) objections to discharges;
>
> (K) determinations of the validity, extent, or priority of liens;
>
> (L) *confirmations of plans;*
>
> (M) orders approving the use or lease of property, including the use of cash collateral;
>
> (N) *orders approving the sale of property other than property resulting from claims brought by the estate against persons who have not filed claims against the estate;*

11

     (O) other proceedings affecting the liquidation of the assets of the estate or the adjustment of the debtor-creditor or the equity security holder relationship, except personal injury tort or wrongful death claims; and

     (P) recognition of foreign proceedings and other matters under chapter 15 of title 11.

28 U.S.C. § 157(b)(2) (emphasis added).   If a matter is not a core proceeding, but is otherwise "related to" a case under title 11, the bankruptcy court may also hear a matter and "submit proposed findings of fact and conclusions of law to the district court."   28 U.S.C. § 157(c)(1).   Finally, this Court "may withdraw, in whole or in part, any case or proceeding referred under this section, on its own motion or on timely motion of any party, for cause shown."   28 U.S.C. § 157(d).

At the outset, this Court finds that the bankruptcy court properly found that it had statutory jurisdiction to enforce its own orders.   Here, Hudson's injunction motion was a "core" matter under the plain language of the Bankruptcy Code.   The bankruptcy court explicitly found that its jurisdiction was "derived from 28 U.S.C. § 1334(b) and this District Court's Standing Orders of Reference of July 23, 1984 and September 12, 2012."   *In re Christ Hosp.*, 502 B.R. at 180 n.25. The bankruptcy court further explained:

> This matter is "core," emanating from 28 U.S.C. § 157(b)(2)(L) and (N), now presented as a motion to enforce terms of the § 363 Sale Approval Order and the Confirmation Order.   This matter "arises under title 11" (§ 363 and the statutory confirmation process), and "arises in" a case under title 11 (that is, the collateral attack on this court's orders undertaken during the pendency of this Chapter 11 case).

*Id.*   Thus, the bankruptcy court held that the "[e]nforcement motions relating to [the Sale Order and Confirmation Order] are . . . 'core] and squarely within [its] jurisdiction to hear and determine."   *Id.* at 180.

12

The Supreme Court's seminal opinion in *Stern v. Marshall* does not disturb the bankruptcy court's jurisdiction.   The bankruptcy court correctly noted that Prime "fail[ed] to relate [*Stern*] specifically to § 363 sales, *in rem* bankruptcy jurisdiction, or anything factually analogous to the matter at bar."   *In re Christ Hosp.*, 502 B.R. at 182.   And it properly held that its "jurisdiction to interpret and enforce its sale and confirmation orders is historic and unimpeded by *Stern v. Marshall* or other recent developments in the law."   *Id.* at 185.

In *Stern*, the Supreme Court held that, although the debtor's counterclaim was indeed a core proceeding pursuant to the plain language of § 157(b)(2)(C), the bankruptcy court lacked constitutional authority to adjudicate a debtor's state-law counterclaim against a creditor.   131 S. Ct. at 2620.   But the Court also explained that it did not believe "the removal of counterclaims such as [the debtor's] from core bankruptcy jurisdiction meaningfully changes the division of labor in the current statute" and that its holding was a "*narrow*" one.   *Id.* (emphasis added).

The Supreme Court in *Stern* considered whether the bankruptcy court had exceeded its statutory authority under 28 U.S.C. § 157(b) and its constitutional authority to issue a final judgment on debtor Vickie Lynn Marshall a.k.a. Anna Nicole Smith's ("Anna Nicole") state-law counterclaim.   *Id.* at 2601.   After her husband J. Howard Marshall II's ("Howard") death, Anna Nicole filed for Chapter 11 relief in a California bankruptcy court.   *Id.*   Howard's son, E. Pierce Marshall ("Pierce"), filed a defamation complaint in the bankruptcy case against Anna Nicole, alleging that Anna Nicole had "defamed him by inducing her lawyers to tell members of the press that he had engaged in fraud to gain control of his father's assets."   *Id.*   Pierce then filed a proof of claim, seeking a declaration that the defamation claim was not dischargeable in Anna Nicole's bankruptcy.   *Id.*   Anna Nicole asserted a counterclaim against Pierce for tortious interference

13

with the gift she expected from her late husband.   *Id.*

The Supreme Court first addressed that the statutory question, finding that "core proceedings are those that arise in a bankruptcy case or under Title 11" and that the list in section 157(b)(2) of Title 28 is illustrative.   *Id.* at 2605.   And the Court held that as a statutory matter, "§ 157(b)(2)(C) permits the bankruptcy court to enter a final judgment on her tortious interference counterclaim."   *Id.*

Notwithstanding the bankruptcy court's statutory authority, however, the Supreme Court also held that the bankruptcy court could not constitutionally enter a final judgment on the state counterclaim because that would infringe on the judicial power granted to Article III courts.   *Id.* at 2608-09.   The Court reasoned that Article III "protect[s] citizens subject to the judicial power of the new Federal Government from . . . abuses[, b]y appointing judges to serve without term limits, and restricting the ability of the other branches to remove judges or diminish their salaries." *Id.* at 2609.   As a result, Article III courts render judicial decisions, "not with an eye toward currying favor with Congress or the Executive, but rather with the 'clear heads . . . and honest hearts' deemed 'essential to good judges.'"   *Id.* (citation omitted).   Article III's purpose is, therefore, frustrated if Congress "could confer the Government's judicial Power on entities outside Article III."   *Id.* (quotation marks omitted).

Significantly, the Supreme Court in *Stern* also found that the counterclaim did not constitute a "public rights" dispute that could be decided by a non-Article III court because Anna Nicole's counterclaim did not flow from a federal statutory scheme, but concerned a private "state law action independent of the federal bankruptcy law."   *Id.* at 2621.   The Court distinguished between public rights—i.e., "integrally related to particular federal government action"—and

private rights—i.e., "liability of one individual to another under the law."   *Id.* at 2612-13 (citations and quotation marks omitted).   Thus, the Court held that the bankruptcy court's decision on the merits of a state-law counterclaim based on a private right was an impermissible exercise of judicial power.   *Id.* at 2615.

The Supreme Court further reasoned that "[t]he Bankruptcy Court below lacked the constitutional authority to enter a final judgment on a state law counterclaim that *is not resolved in the process of ruling on a creditor's proof of claim*."   *Id.* at 2620 (emphasis added).   And the Court found that Anna Nicole's counterclaim was "in no way derived from or dependent upon bankruptcy law; it [was] a state tort action *that exists without regard to any bankruptcy proceeding*."   *Id.* at 2618 (emphasis added).   Thus, the vital question was "whether the action at issue stems from the bankruptcy itself or would necessarily be resolved in the claims allowance process."   *Id.*

Considering *Stern's* "narrow" holding and the significantly distinct facts involving a § 363 sale presented here, this Court is not compelled to extend *Stern's* reach to the bankruptcy court's authority to enforce its own orders pursuant to § 157(b)(2)(L) and (N) in the instant matter.   *See In re New Century TRS Holdings, Inc.*, 544 F. App'x 70, 73 (3d Cir. 2013) (recognizing that *Stern's* holding that "the authority granted by Congress to the bankruptcy courts exceeded the limitations of Article III" was made in "'one isolated respect'" and did not apply where the debtor's claims were "not independent of the bankruptcy but rather irreversibly intertwined with the Bankruptcy Court-approved resolution of [the debtor's] underlying claims against the bankruptcy estate"); *In re Lazy Days' RV Ctr. Inc.*, 724 F.3d 418, 423 (3d Cir. 2013) (finding *Stern* inapposite because the "Bankruptcy Court in this case did not decide a question of state common law, but rather

determined whether in light of 11 U.S.C. § 365(f)(3), an anti-assignment clause survived the Settlement Agreement it had confirmed as part of a Chapter 11 bankruptcy"); *In re River Entm't Co.*, 467 B.R. 808, 816-18 (Bankr. W.D. Pa. 2012) (finding that *Stern* did not preclude bankruptcy court's authority where the resolution of the matter was entirely dependent on court's interpretation and enforcement of court's prior order and not dependent on adjudication of an independent state law claim); *In re CD Liquidation Co.*, 462 B.R. 124, 136 (Bankr. D. Del. 2011) (finding *Stern* inapposite where injunction motion "did not raise any substantive or state law issues," but involve[d] the most basic and intrinsic authority of this or any court – the authority to enforce its [Confirmation Order]").[4]

Indeed, *Stern's* holding was limited to "*one isolated respect*" involving the bankruptcy court's lack of "constitutional authority to enter a *final* judgment on a state-law *counterclaim* that [was] *not resolved in the process of ruling on a creditor's proof of claim.*"   131 S. Ct. at 2620 (emphasis added).   Nothing in the *Stern* opinion explicitly bars a bankruptcy court's authority to adjudicate other "core" proceedings in section 157(b)(2), including "confirmation of plans" and "orders approving the sale of property other than property resulting from claims brought by the estate against persons who have not filed claims against the estate." 28 U.S.C. § 157(b)(2)(L) and (N).

---

[4] *See also In re Land Resource, LLC*, 505 B.R. 571, 578-82 (M.D. Fla. 2014) (declining to extend *Stern's* narrow holding to "limit bankruptcy courts' authority to approve settlement of claims that are property of the debtor's estate" and where the "bankruptcy court did not enter a judgment on the merits of any of Appellant's potential state law claims"); *In re MPF Holding U.S. LLC*, 495 B.R. 303, 314 (Bankr. S.D. Tex. 2013) (stating that "the dispute at bar is distinguishable from *Stern* because it requires this [c]ourt to interpret language in the Plan" and the relief sought was "based on express provisions of the Code rather than on state law"); *In re Safety Harbor Resort & Spa*, 456 B.R. 703, 715-18 (Bankr. M.D. Fla. 2011) (finding that *Stern* did not limit bankruptcy court's authority to adjudicate other "core" proceedings such as a confirmation of a plan and concluding that injunction was an integral part of the court's confirmation order); *In re Okwonna-Felix*, No. 10-31663-H4-13, 2011 WL 3421561, at *4-5 (Bankr. S.D. Tex. Aug. 3, 2011) (finding *Stern* inapposite because the resolution of the motion was not based on "purely state law issues," but rather "involved the adjudication of rights created by the Bankruptcy Code").

Here, the bankruptcy court did not resolve the merits of the common-law claims but rather it enforced its own orders in an action that stemmed from the bankruptcy sale.   The bankruptcy court properly issued an Injunction Order that was necessary to protect the § 363 sale and therefore the issue stemmed directly from the bankruptcy itself.   To be sure, the bankruptcy court stated:

> It should be clear, contrary to Prime's argument, that the *in rem* bar here is *not* a resolution of state law claims, nor is such a resolution necessary to decide the pending motion. That bar is an estoppel; it is based upon bankruptcy sale/marketplace necessities and, in this case Prime's conduct as well. Similarly, Prime's contentions that its economic tort claims do not "arise under title 11" or "arise in a case under title 11," and are thus not derived from the debtor or the bankruptcy case or law, misses the point that those claims are § 363(f) interests. It is the bankruptcy sale (including order enforcement) which is "core" here, not resolution of the economic tort claims alleged by Prime.

*In re Christ Hosp.*, 502 B.R. at 182 (emphasis in original).   As such, this Court finds that the bankruptcy court "assert[ed] its historic and time-honored jurisdiction to interpret and enforce its own prior orders."   *Id.*   The bankruptcy court, therefore, did not exceed its statutory or constitutional authority in issuing its Injunction Order, which barred—but did not adjudicate—the common-law claims on the merits.[5]

---

[5] First, because this Court finds that the bankruptcy court had jurisdiction to issue the Injunction Order and because all matters are now before this Court—which was the relief sought in Prime's motion to withdraw the reference—the request to withdraw the reference is moot.   (May 16, 2014 Tr. 173:24-175:5).   Second, having found that the injunction motion was a "core" matter, this Court declines to address "related-to" jurisdiction.   Third, because Prime raises for the first time on appeal that the bankruptcy court's jurisdiction was limited once it had confirmed the plan, this Court exercises its discretion and declines to address this issue.   Even if this argument was properly before this Court, Prime conceded that the issue was raised as an "undeniable corollary" to its related-to-jurisdiction argument, which this Court again does not address here.   (Prime's May 19, 2014 Letter at 1, D.E. No. 19).   Finally, because the injunction motion did not present any matters that required a jury and because this Court already explained that the motion did not resolve the common-law claims on their merits, the Court finds that Prime's argument that its Seventh Amendment right to a jury trial was violated is meritless.   (Prime Br. at 55-56).

**B.    Prime's Common-Law Claims Were Interests in the Sale Order and a Collateral Attack on the Bankruptcy Court's Good-Faith Finding**

Prime also argues that the bankruptcy court erred in concluding that the common-law claims were "interests" in the sale of the hospital assets for purposes of the free and clear provisions of the Sale Order.   (Prime Br. at 32-37).   And Prime contends that the bankruptcy court did not consider Hudson's pre-petition conduct in making its good-faith finding and that Prime's common-law claims against Hudson were not a collateral attack on the bankruptcy's finding.   (*Id.* at 37-40).

Hudson counters that Prime's common-law claims were "interests" in the property for purposes of the free and clear provisions of the Sale Order because those claims were directly connected and arose from the sale of the hospital's assets.   (Hudson Opp. at 33-36).   Hudson further responds that the bankruptcy court's good-faith finding necessarily considered pre-petition conduct and that Prime's common-law claims are a collateral attack on the Sale Order.   (*Id.* at 36-41).

The Bankruptcy Code provides that "[t]he trustee, after notice and a hearing, may use, sell, or lease, other than in the ordinary course of business, property of the estate."   11 U.S.C. § 363(b)(1).   Section 363(f) of the Bankruptcy Code states, in pertinent part:

> The trustee may sell property under subsection (b) or (c) of this section *free and clear of any interest in such property* of an entity other than the estate, only if--
>
> (1) applicable nonbankruptcy law permits sale of such property free and clear of such interest;
>
> (2) such entity consents;
>
> (3) such interest is a lien and the price at which such property is to be sold is greater than the aggregate value of all liens on such

> property;
>
> (4) such interest is in bona fide dispute; or
>
> (5) such entity could be compelled, in a legal or equitable proceeding, to accept a money satisfaction of such interest.

11 U.S.C. § 363(f) (emphasis added).   This section authorizes the sale free and clear of any interest that a party has in property of the estate.

Although the Bankruptcy Code does not define "interests," courts have recognized the broadening trend in defining the scope of sale-affected interests in property.   *In re Trans World Airlines, Inc.*, 322 F.3d 283, 290 (3d Cir. 2003) (finding that although "the interests of the EEOC and the [travel voucher holders] in the assets of TWA's bankruptcy estate are not interests in property in the sense that they are not *in rem* interests, . . . they are interests in property within the meaning of section 363(f) in the sense that they arise from the property being sold"); *Folger Adam Sec., Inc. v. DeMatteis/MacGregor, JV*, 209 F.3d 252, 258 (3d Cir. 2000) ("Although some courts have limited the term to *in rem* interests in the property, the trend seems to be in favor of a broader definition that encompasses other obligations that may flow from ownership of the property."). Interests in property afforded sale protections thus may refer broadly to "obligations that are connected to, or arise from, the property being sold."   *Folger Adam*, 209 F.3d at 259.

Additionally, when a bankruptcy court authorizes a sale of property assets, it is required to make a finding with respect to the purchaser's "good faith," which analyzes the purchaser's conduct leading up to the sale.   *In re Abbotts Dairies of Pa., Inc.*, 788 F.2d 143, 149-50 (3d Cir. 1986).   "Typically, the misconduct that would destroy a purchaser's good faith status at a judicial sale involves fraud, collusion between the purchaser and other bidders or the trustee, or an attempt to take grossly unfair advantage of other bidders."   *Id.* at 147 (quoting *In re Rock Indus. Mach.*

19

*Corp.*, 572 F.2d 1195, 1198 (7th Cir. 1978).

Significantly, courts have routinely included interests that arose pre-petition under Section 363(f).   *Id.* at 148-49 (stating that the purchaser's good faith status was destroyed by the pre-petition collusion between the debtor and the purchaser relating to the timing of the bankruptcy filing to discourage competitive bidding); *In re Polaroid Corp.*, No. 03-1168, 2004 WL 2223301, at *2 (D. Del. Sept. 30, 2004) (stating that the bankruptcy court "expressly found that [the purchaser] was a good faith purchaser based on the fact that the Debtors' assets had been effectively shopped before the petition was filed"); *In re Trans World Airlines, Inc.*, Nos. 01-056 & 01-226, 2002 WL 500569, at *1 n.1 (D. Del. Mar. 26, 2002) (considering factual evidence to determine whether "the timing of this bankruptcy filing and the expedited nature of the bidding process was orchestrated by [the purchaser] to preclude or 'chill' other bids") (citation omitted); *In re Tempo Tech. Corp.*, 202 B.R. 363, 368-70 (D. Del. 1996) (considering pre-petition and post-petition negotiations in court's good-faith analysis).

Here, the bankruptcy court correctly found that Prime's common-law claims were interests in the sale of Christ Hospital for purposes of the "free and clear" provisions of the Sale Order. Recognizing the broadening trend in § 363(f) interests, the bankruptcy court described the "undeniable linkage—*as Prime has claimed it*—of Prime's asset purchase agreement of December 2011, its purported 'loss' of the benefit of that agreement, the supposed 'forcing' of the hospital into bankruptcy, and the sale of hospital assets at a diminished price to Hudson in a bankruptcy auction."   *In re Christ Hosp.*, 502 B.R. at 172.

This Court agrees.   It is the nature of Prime's common-law claims—which arose pre-petition and continued post-petition—that "are connected to, or arise from, the property being

sold" and thus fall within the scope of § 363(f). *See In re Trans World Airlines, Inc.*, 322 F.3d at 289 (citing *Folger Adam*, 209 F.3d at 259). Prime's argument fails. It argues that its "state court action does not allege any interest in Christ Hospital property," but arises "from Hudson's pre-bankruptcy action meant to undermine Prime Healthcare's contract to purchase Christ Hospital." (Prime Br. 33-34). But Prime improperly divorces the factual allegations that are connected to the hospital assets being sold, i.e., the pre-petition APA that Prime withdrew, allegedly as a result of Hudson's bad faith, that led to the "forced" bankruptcy sale of Christ Hospital's assets at a lower price. As such, the common-law claims were "interests" in the sale of Christ Hospital's assets that were entitled to free and clear protections in the Sale Order and Confirmation Order.

This Court also agrees that the bankruptcy court's good-faith finding "bec[ame] another target of Prime's collateral attack." *In re Christ Hosp.*, 502 B.R. at 179. Specifically, the Sale Order found that the § 363(m) successful bidder was a good-faith purchaser, (RA3 ¶ K), and that the agreement was entered "from arm's-length bargaining positions and without collusion," (*id.* ¶ L). (*See also* Mar. 27, 2012 Tr. 93:6-16 ("There is nothing in this record that would impugn the good faith of the parties involved here, particularly Hudson and its principals. . . . There's no evidence of fraud or collusion, and no hint at that. And so, this Court specifically finds that the purchaser acted in the best of good faith in moving the auction along, making its bids, providing financial information . . . .")). Having made these factual findings, the bankruptcy court ordered § 363(m) protections as to the finality of the sale of the assets of Christ Hospital. (*Id.* ¶ 24). The bankruptcy court explained that its "finding that Hudson was acting as a 'good faith' purchaser, under the circumstances of this case, counters Prime's necessary tort assertion of Hudson's

21

malicious behavior."   *Id.* at 178-79.

Because the bankruptcy court's factual findings were not clearly erroneous, this Court does not disturb those findings.   The bankruptcy court correctly reasoned that Prime's alleged common-law claims that asserted a "'forced' filing of the hospital's Chapter 11 petition and the § 363 sale processes (including allegedly grossly unfair treatment of Prime as a prepetition would-be purchaser and a devaluing of the sale assets)" were "thoroughly *inconsistent*" with the § 363(m) finding.   *Id.* at 178.

And it is clear that the bankruptcy court considered Prime's pre-petition conduct in its review of the Debtor's motion in support of the Sale Order, which described the Debtor's pre-petition efforts to market its assets for sale including to potential purchasers like Prime.[6]   (RAIA4 at 4-8); *see In re Abbotts Dairies of Pa., Inc.*, 788 F.2d at 148-49 (analyzing the purchaser's conduct leading up to the sale).   At the March 27, 2012 hearing, before entering the Sale Order, the bankruptcy court stated:   "I made no secret of the fact that I was concerned that upon the filing of the petition parties, each of you, CHA and Hudson, who were involved pre-petition, looks like you retrenched from at least prior tentative offers in terms of the dollars, and by a lot, not an insubstantial amount."   (Mar. 27, 2012 Tr. 42:12-16).   To be sure, Prime also cites to the March 23, 2012 hearing, in which the Debtor's counsel expressed frustration about the pre-petition events, stating:   "Your Honor I think felt my frustration . . . [because] we had a deal with somebody else that we thought was very good, and words thrown on a piece of paper led to a political firestorm. . . . So, we lost a very good and simple deal. . . ."   (Mar. 23, 2012 Tr. 84:16-25).   As such, the

---

[6]  To the extent the bankruptcy court was unaware of Prime's tort allegations, the Court agrees with the bankruptcy court that "Prime, *solely aware of its position as a potential tort claimant*, stood by knowingly and without objection, at every stage of the bankruptcy case which affected its claims."   *In re Christ Hosp.*, 502 B.R. at 174.

bankruptcy court plainly considered the pre-petition events leading up to the sale.

This Court, therefore, finds that Prime's common-law claims were a collateral attack on the free and clear provisions and good-faith finding in the Sale Order.   Here, Prime's common-law claims were undeniably linked to the sale of Christ Hospital's assets, which sale was entitled to free and clear protections.   And Prime collaterally attacked the bankruptcy court's good-faith finding that analyzed Hudson's known prepetition conduct.

### C.   The Injunction Order Did Not Violate Prime's Due Process Rights

Prime further argues that the Injunction Order violated Prime's due process rights because it could not have been on notice that its common-law claims would be enjoined.   (Prime Br. at 41-51).   Prime also contends that it did not consent to the free and clear sale of the hospital's assets.   (*Id.* at 52-53).   In contrast, Hudson maintains that the bankruptcy court did not violate Prime's due process rights because Prime was on notice that its claims were included in the Sale Order.   (Hudson Opp. at 42-48).   Hudson further argues that Prime consented to the free and clear sale of the assets of Christ Hospital.   (*Id.* at 49-51).

The Third Circuit has held that "[d]ue process requires 'notice reasonably calculated, under all the circumstances, to apprize interested parties of the pendency of the action and afford them an opportunity to present their objections.'"   *Folger Adam*, 209 F.3d at 265 (quoting *Mullane v. Central Hanover Bank & Trust Co.*, 339 U.S. 306, 314-15 (1950)).   Further, Sections 363(e) and (f) of Title 11 of the Bankruptcy Code provide adequate protections to holders of affected interests where they have notice of a free and clear sale.

Section 363(e) provides that "at any time, on request of an entity that has an interest in property used, sold, or leased, or proposed to be used, sold, or leased, by the trustee, the court,

with or without a hearing, shall prohibit or condition such use, sale, or lease as is necessary to provide adequate protection of such interest."   11 U.S.C. § 363(e).

Section 363(f)(2) further provides that a "trustee may sell property under subsection (b) or (c) of this section free and clear of any interest in such property of an entity other than the estate, only if such entity consents."   11 U.S.C. § 363(f)(2).   Silence by affected claim holders may constitute consent for purposes of section 363(f)(2).   *FutureSource LLC v. Reuters, Ltd.*, 312 F.3d 281 (7th Cir. 2002) (stating that "lack of objection . . . counts as consent"); *see also In re Congoleum Corp.*, No. 03-51524, 2007 WL 1428477, at *1 (Bankr. D.N.J. May 11, 2007) (finding that "failure to object to a notice of sale free and clear is deemed consent to the sale for purposes of § 363(f)(2)"); *In re Tabone, Inc.*, 175 B.R. 855, 858 (Bankr. D.N.J. 1994) (same); *In re Elliot*, 94 B.R. 343, 345 (E.D. Pa. 1988) (same).

This Court finds that the bankruptcy court did not err in determining that "what is most obvious is that Prime was on notice and could have been nothing but acutely aware of (i) the bankruptcy sale process, and (ii) the proposed terms of the bankruptcy sale of hospital assets which it had so intensely pursued and *contracted to purchase*."   *In re Christ Hosp.*, 502 B.R. at 174 (emphasis in original).   Notably, Prime was on notice of the bankruptcy proceedings since February 7, 2012—one day after Christ Hospital filed its bankruptcy petition—when it filed its Notice of Appearance, which "enabled it to keep tabs on the entire case."   *Id.* at 174 n.17; (RAIA2).   And it was a pre-petition party who "contracted to purchase" the assets that were ultimately sold to the successful bidder.   Prime also had a "financial interest in the outcome of the bankruptcy proceeding" because it "had last-out participation rights in a loan issued by a third party to the debtor" and the lender submitted a proof of claim in the bankruptcy proceeding.

24

(Prime's Mar. 20, 2014 Letter, D.E. No. 17) (citation and quotation marks omitted).    Thus, although it was represented by knowledgeable counsel, Prime chose not to object to the transfer of the hospital assets at any stage and cannot now claim that it was unaware that the § 363 sale included free and clear and finality protections.

The Sale Order explicitly protected the transfer of the hospital assets from "Liens and Claims," which included "causes of action and claims, to the fullest extent of the law . . . known or unknown, whether arising prior to, on, or subsequent to the Petition Date."    (RA3 ¶ 5).    These protections were necessary against "creditors and third parties pursuing the Liens and Claims . . . to induce the Successful Bidder" to purchase the hospital assets, (*id.* ¶ T), and resulted in a permanent injunction barring "persons and entities" from "asserting . . . Liens and Claims against the Successful Bidder Entities," (*id.* ¶ 6).    The bankruptcy court also "retain[ed] exclusive jurisdiction to enforce the provisions of [the Sale Order], and to resolve any dispute concerning this Order" including disputes "concerning the transfer of the Assets free and clear of the Liens and Claims."    (*Id.* ¶ 15).    And these protections were reaffirmed by the Confirmation Order. (RA7).

Having received notice of the free and clear sale—which broadly applied to "causes of action and claims, to the fullest extent of the law . . . known or unknown, whether arising prior to, on, or subsequent to the Petition Date"—Prime failed to avail itself of §§ 363(e) and (f) that provided adequate protections to preserve its rights on its alleged common-law interests.    (RA3 ¶ 5).    This Court finds that Prime was placed on notice to satisfy any due process and fairness concerns and chose to remain silent.    The bankruptcy court also correctly held that the "net effect of notice to, knowledge of, and nonobjection by Prime to the fully public bankruptcy sale process"

25

resulted in consent for purposes of section 363(f)(2).   *In re Christ Hosp.*, 502 B.R. at 174

(footnote omitted).   The *in rem* orders that followed "transfer[red] property rights, and property

rights are rights good against the world, not just against parties to a judgment or persons with

notice of the proceeding."   *In re Met-L-Wood Corp.*, 861 F.2d 1012, 1017 (7th Cir. 1988).

### D.   The Injunction Order Did Not Violate Federal and State Comity

Prime also contends that the Injunction Order infringed on the principles of federal-state

comity because the state court first issued a decision on the common-law claims.   (Prime Br. at

56-57).   Prime claims that the bankruptcy court should have abstained from deciding Hudson's

motion for an injunction and that the bankruptcy court did not have the power to overrule the state

court.   (*Id.* at 57-61; *see also* May 16, 2014 Tr. 160:21-162:5).   In effect, Prime argues that the

bankruptcy court condoned Hudson's forum shopping when it considered the injunction motion.[7]

(*Id.* at 61-63).

In opposition, Hudson argues that the bankruptcy court was not required to defer to the

state court matter that was initiated in violation of the Sale Order.   (Hudson Opp. at 52-55).

Hudson also asserts that the state court interlocutory order was not entitled to full faith and credit

deference because it was not a final order and void *ab initio*.   (*Id.* at 56-58).

The bankruptcy court was not convinced by Prime's argument that the bankruptcy court

was required to defer to the state court action because this case was still pending in bankruptcy

court when Prime filed its state court action.   *In re Christ Hosp.*, 502 B.R. at 186.   This Court

---

[7] Because Prime raises mandatory abstention for the first time on appeal, this Court declines to address this issue. To be sure, Prime cites its opposition brief to Hudson's motion for an injunction before the bankruptcy court to show that it previously raised this argument.   (Prime's May 19, 2014 Letter at 2, D.E. No. 19).   In that brief, however, Prime did not raise the relevant standard on mandatory abstention, but rather addressed permissive abstention under 28 U.S.C. § 1334(c)(1).   (*In re Christ Hosp.*, No. 12-12906, D.E. No. 1302 at 24-25 (Bankr. D.N.J.)).

agrees.   Critically, the bankruptcy court explained that it was authorized "to issue any order, process, or judgment that is necessary or appropriate to carry out the provisions of [Title 11]," i.e., to "tak[e] any action or mak[e] any determination necessary or appropriate to enforce or implement court orders or rules, or to prevent an abuse of process."   11 U.S.C. § 105(a).   The relief sought in the injunction motion was that the bankruptcy court interpret and enforce its own Sale Order and Confirmation Order.   The bankruptcy court also appropriately limited its injunction to "cover the collateral attack on Christ Hospital, not more general restrictions on the State litigation."   *In re Christ Hosp.*, 502 B.R. at 184; *see also id.* at 186 ("Of course, the injunction should be limited to the collateral attack in the State litigation to those counts . . . which seek damages for economic torts said to have been committed by Hudson in connection with its § 363(b) purchase of hospital assets.").

The August 22, 2013 Opinion and Order by the state court, on the other hand, was an interlocutory order that sought to "interpret, at the pleading stage of the State litigation, preexisting bankruptcy court orders during the pendency of this bankruptcy case, [was] not binding on the [bankruptcy] court, nor did it preempt Hudson's application [before the bankruptcy court]."   *Id.* at 186.

The Court is not persuaded by Prime's reliance on *England v. Louisiana State Board of Medical Examiners*, which applied principles of res judicata to abstention because the New Jersey state order was not a final judgment.   *See* 375 U.S. 411 (1964).   There, the Supreme Court stated that "if a party freely and without reservation submits his federal claims for decision by the state courts, litigates them there, and *has them decided there*, then . . . he has elected to forgo his right to return to the District Court."   *Id.* at 419 (emphasis added).   But *England* applied res judicata

27

principles between federal and state courts and required a final judgment.   *Id.*

Prime's reliance on *In re James*—where a bankruptcy court vacated a state court judgment that entered default judgment in a civil forfeiture proceeding—is also misplaced because, there, the Court held that federal courts owed state courts full faith and credit of *valid* and final orders. 940 F.2d 46, 51-52 (3d Cir. 1991).   Although the Third Circuit stated that "federal district courts and federal courts of appeals lack jurisdiction to review or reverse a state court judgment on the merits," it explained that an exception to federal-state comity exists where the "state proceedings are considered a legal nullity and thus void *ab initio*."   *Id.* at 52.   The Court further reasoned that "[the bankruptcy court] lacks power where it simply disagrees with the result obtained in an otherwise valid [state] proceeding."   *Id.*   To be sure, the Court concluded that, in *In re James*, "the district court premised its decision to vacate the state court judgment on its perception that the state court judgment was erroneously decided on the merits, not that the state court lacked jurisdiction over the subject matter or parties."   *Id.*   Here, as this Court has held, Prime's common-law claims collaterally attacked the bankruptcy court's orders, which the bankruptcy court had historic jurisdiction to enforce.   Unlike *In re James,* the bankruptcy court here did not issue the injunction because it disagreed with result in state court on the merits.

Accordingly, the bankruptcy court did not have to abstain from deciding Hudson's motion for an injunction, which sought to enforce and interpret its own orders and which did not encroach on final orders in state court.

### E.   The Bankruptcy Court Did Not Abuse Its Discretion in Denying the Stay Motion

Finally, Prime argues that requiring Prime to dismiss its state action before this Court could address whether the bankruptcy court had jurisdiction in the first place was an abuse of discretion.

(Prime Br. at 63-70).    In other words, Prime claims that the bankruptcy court should have granted its motion to stay.    (*Id.*).    Hudson responds that the bankruptcy court's denial of the stay pending appeal is entitled to deference and was properly denied because there was no legal basis for the stay.    (*Id.* at 63-66).

Because this Court finds that the bankruptcy court properly exercised its statutory and constitutional jurisdiction to issue the Injunction Order at issue here, Prime's motion to stay the Injunction Order is now moot.    (*See* May 16, 2014 Tr. at 171:15-172:2, 173:8-17).    Both parties agreed and stipulated to staying the state court proceedings, pending the instant appeals to this Court that are decided in this opinion.    (No. 13-7881, D.E. No. 14; *see also* Prime's July 25, 2014 Letter (staying State litigation until October 14, 2014, subject to further renewal)).    Indeed, at oral argument, counsel for Prime conceded that "if the Court determined jurisdiction was proper, . . . if the State court stay which is in existence continues, then it is moot and we don't need to impose on the Court . . . the issuance of her opinion with respect to the issue, when the stay makes timing a major nonissue."    (*Id.* at 173:10-17).

## IV. CONCLUSION[8]

For the foregoing reasons, the Court AFFIRMS the bankruptcy court's Injunction Order, and finds that Prime's requests to withdraw the reference and to stay the appeals are moot.   This matter is CLOSED.


_s/ Esther Salas_
Esther Salas, U.S.D.J.

---

[8]  As alternative bases for affirming the bankruptcy court's Injunction Order, Hudson argues that Prime was also barred by res judicata and collateral estoppel from relitigating claims that could have been raised during the sale process.   (Hudson Opp. at 58-63).   Because this Court finds that the Injunction Order was a properly issued, this Court declines to address this argument.